378 So.2d 43 (1979)
DADE COUNTY, Florida, a Subdivision of the State of Florida, Appellant,
v.
HOSPITAL AFFILIATES INTERNATIONAL, INC., a Delaware Corporation, Appellee.
No. 79-115.
District Court of Appeal of Florida, Third District.
December 4, 1979.
Rehearing Denied January 8, 1980.
Stuart L. Simon, County Atty. and Vicki Jay, Asst. County Atty., for appellant.
Paul & Thomson and Sanford L. Bohrer, Miami, for appellee.
Before PEARSON, HUBBART and SCHWARTZ, JJ.
SCHWARTZ, Judge.
Dade County, the defendant below, appeals from a final money judgment, entered after a non-jury trial, in favor of the plaintiff-appellee, Hospital Affiliates International, Inc., the owner of Miami-Dade General Hospital. The judgment, which was for the bills of two otherwise indigent patients, was based on the theory that, while hospitalized, they were "county prisoners" for whose medical expenses the county was responsible. We reverse.
On September 1, 1975, Dade County Public Safety Department (PSD) officers were summoned to the scene of a domestic-type altercation in the unincorporated area of the county. They found two men, Remus Williams and Morris Morley, lying on the ground; both of them were seriously injured with mutually-inflicted multiple knife wounds. The two men were almost immediately transported, under PSD supervision, to Miami Dade General Hospital. Morley went by Randle-Eastern ambulance; Williams by PSD helicopter. Both were treated in the emergency room and then formally admitted to the hospital. Morley was discharged to his home on September 7, having incurred expenses of $4,602.25. Williams was transferred to Jackson Memorial Hospital on September 26, 1975; his Miami-Dade General bill was $24,184.95. In the judgment under review, the county was held liable in the total amount of $28,787.20 for the services rendered to both men.
The PSD commenced its investigation of the circumstances leading to the men's wounds almost immediately. That investigation soon revealed the likelihood that Williams had been the aggressor in the knife fight. It is undisputed, however, that neither man was ever either formally or informally placed under arrest or taken into custody during the course of their stays at Miami-Dade. Neither was guarded or otherwise restricted in his movements by anything other than his physical condition. Although there was evidence that a PSD officer informed a hospital representative that *44 the men were subject to a "police hold," these words of art possess no accepted legal meaning and were shown to involve only a request to the hospital not to release the patients without first informing the authorities. In the event, not even this occurred. Without the PSD's knowledge or approval in either case, Morley was discharged outright from Miami-Dade General, and Williams was transferred "for financial reasons" to JMH, where he was treated, as he had been at Miami-Dade, as an ordinary patient and not confined to the prison ward (ward D) of the hospital.
No legal action of any kind was ever taken against Morley. As to Williams, the record shows that after Morley told him he wished to press charges, the investigating homicide officer secured an arrest warrant from a magistrate on October 8, 1975. Williams was arrested on the warrant on December 20, 1975, almost three months after he left Miami-Dade. Although Williams was subsequently bound over to Circuit Court, the family members reconciled and, at Morley's request, the State Attorney nolle prossed the case.[1]
The hospital's action in this case is bottomed upon the claim that it discharged what was primarily the county's duty, imposed by Sec. 951.23(2)(b), Fla. Stat. (1975),[2] to provide medical treatment to "county ... prisoners" who are detained in a "county detention facility." See also Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), which imposes an Eighth Amendment constitutional obligation to provide such services to persons in custody; Lutheran Medical Center of Omaha v. City of Omaha, 204 Neb. 292, 281 N.W.2d 786 (1979). Although there are no cases in Florida which directly so hold, we may assume that a county or other governmental entity would be liable[3] to a private physician or hospital which renders medical services to its prisoners. 1946 Op.Att'y Gen.Fla. 046-424 (Oct. 3, 1946); 1959 Op. Att'y Gen.Fla. 059-18 (Jan. 30, 1959), 059-148 (July 31, 1959); 1975 Op.Att'y Gen.Fla. 075-35 (Feb. 17, 1975), 075-47 (Feb. 20, 1975); 1975 Op.Dade County Atty. 75-25; Lutheran Medical Center of Omaha v. City of Omaha, supra, and cases collected. In this instance, however, it clearly appears, as a matter of law, that the county was not responsible for Williams, much less Morley, while they were hospitalized at Miami-Dade. In a word, neither was a county prisoner, or in county custody at any time during the pertinent period.
The statutory underpinning for the duty sought to be imposed upon Dade County, Sec. 951.23(1)(a-b), defines the controlling terms as follows:
(a) As used in this section, the term `county detention facility' means a county jail, a county stockade, a county prison camp and any other place except a municipal detention facility used by a county or county officer for the detention of persons charged with or convicted of either felony or misdemeanor.

(b) The term `county prisoner' means a person who is detained in a county detention facility by reason of being charged with or convicted of either felony or misdemeanor. ... [e.s.]
It is obvious that Morley and Williams were not "detained," had not been "charged" and had not been taken into county custody by virtue of having been arrested before or at any time during their respective stays at the hospital. A simple comparison of the uncontradicted facts with the applicable law on the subject establishes this conclusion *45 beyond question. In Melton v. State, 75 So.2d 291, 294 (Fla. 1954), the supreme court set forth the requisite of an "arrest" as follows:
It is uniformly held that an arrest, in the technical and restricted sense of the criminal law, is `the apprehension or taking into custody of an alleged offender, in order that he may be brought into the proper court to answer for a crime.' Cornelius, Search and Seizures, 2nd ed., Sec. 47. When used in this sense, an arrest involves the following elements: (1) A purpose or intention to effect an arrest under a real or pretended authority; (2) An actual or constructive seizure or detention of the person to be arrested by a person having present power to control the person arrested; (3) A communication by the arresting officer to the person whose arrest is sought, of an intention or purpose then and there to effect an arrest; and (4) An understanding by the person whose arrest is sought that it is the intention of the arresting officer then and there to arrest and detain him. Cornelius, Search and Seizure, 2nd ed., Sec. 47; 6 C.J.S. Arrest § 1.
See also State v. Parnell, 221 So.2d 129 (Fla. 1969); Giblin v. City of Coral Gables, 149 So.2d 561 (Fla. 1963), affirming, 127 So.2d 914 (Fla. 3d DCA 1961); Bey v. State, 355 So.2d 850 (Fla. 3d DCA 1970). The circumstances here involve none of these elements. While Morley and Williams were hospitalized, PSD officers did not intend to effect an arrest,[4] and did not in fact seize or otherwise confine either one. Of course, they did not communicate any such intention to Morley and Williams, who therefore did not themselves "understand" that they were being detained.
The hospital points to evidence that, at least when they were first admitted, either or both men were unconscious. It suggests that, in such a situation, the rules relating to arrest may be relaxed. While the general principle invoked may be correct, it does not avail the appellee in this case in which the record contains no indication at all of any police detention. At the most, the actions of the PSD indicated its continuing interest in the condition and circumstances of the two men. But this is very far from being enough to render either a county prisoner. In Bouldin v. State, 276 Md. 511, 350 A.2d 130 (1976) the court held on facts which were much stronger than those here, that no arrest had been effected of an unconscious hospital patient. At 350 A.2d 133, 135, it was stated
Ordinarily ... there can be no arrest where there is no restraint or where the person sought to be arrested is not conscious of any restraint... . But, as indicated in Fisher, Laws of Arrest, chapter IV at 52 (1967), it is only where there is no actual manual seizure of the arrested person that his intention or understanding assumes controlling importance. Fisher states at 52-53:
`Thus an unconscious person may be placed under arrest when his body is actually seized and restrained, even though his understanding of his plight is delayed until he recovers consciousness. When his person has been taken and made subject to the disposition of the arresting officer, with intention to restrain him in custody of the law, the arrest is complete when this is done. There is sufficient understanding on the part of such a prisoner when he recovers consciousness and finds himself handcuffed, in jail, or perhaps confined to a hospital room with a policeman standing guard over him.'

* * * * * *
[T]he record simply does not show the requisite police restraint or control of Bouldin's person at the time the searches were made. We emphatically reject the State's notion that the arrest took place upon Aston's eyeball contact with the unconscious Bouldin as he lay on the stretcher ... [e.s.]
*46 Similarly, the second district held in State v. Robbins, 359 So.2d 39, 41 (Fla. 2d DCA 1978), that a person taken to a hospital by the police was not then "in custody" for speedy trial purposes, on the ground that:
Although respondent was temporarily detained on the night of the offense, he was not formally arrested or incarcerated. Moreover, it appears the police were merely attempting to establish the cause for respondent's bizarre behavior and, acting out of humanitarian reasons, were patiently attempting to keep respondent from injuring himself. This is further supported by the fact that once respondent was taken to the hospital for medical examination and treatment, the police indicated no further custodial interest in him and he was allowed to leave without further ado.
The non-existence of an arrest or custodial detention of either patient is made all the more clear by comparing the facts before us with those in Lutheran Medical Center v. City of Omaha, supra, which involved, in part, a patient who had been shot by police while fleeing from an armed robbery. At 281 N.W.2d 789-790, the court noted:
It matters not that the suspect was not in jail when he required emergency medical attention, particularly under the facts of this case. Inherent in the trial court's judgment was a finding that when he needed emergency medical attention the suspect was in police custody. ... Here, it was the policeman's shot that felled the defendant. Two affidavits received in evidence by stipulation, with all objections waived, state that once the suspect was apprehended by officers of the Omaha police division, the suspect became a prisoner. The suspect was delivered to plaintiff by defendant's employee. After the suspect's injuries were treated, he was taken to jail Under these circumstances a trier of fact could reasonably infer and conclude that a suspect was in the custody of the police at the time he needed medical attention. [e.s.]
In this case, in direct contrast, there are no facts from which the trial judge could have properly concluded that the persons in question were in custody while they were being treated at the plaintiff hospital.[5] Since that is true, the county may not be held liable for their expenses. See also Saxton *47 v. Sanborn County, 76 S.D. 169, 74 N.W.2d 843 (1956).
The judgment below is accordingly reversed and the cause remanded with directions to enter final judgment for the appellant.
Reversed and remanded.
NOTES
[1] The homicide detective stated that, in domestic conflicts such as the Morley-Williams affair, it was his policy not to make any warrantless arrest even when he had probable cause to believe that a felony had been committed by a particular suspect. Cf. § 901.15(2), Fla. Stat. (1977). The reason for this practice, well borne out by the facts of this case, lies in the likelihood that criminal charges stemming from family disputes will not be pursued.
[2] This provision was implemented by Fla. Admin. Code Rule 10B-8.01, now Rule 33-8.01.
[3] This conclusion assumes also that the doctrine of governmental immunity does not bar such an action. We need not decide that question in this case.
[4] The PSD never intended to charge Morley with any crime, and specifically determined to hold off charging Williams until a time well-subsequent to his transfer from Miami-Dade. See n. 1, supra.
[5] The trial court based the judgment below upon its determination

That the officers of the Dade County Public Safety Department had reasonable grounds to believe a crime had been committed. Therefore, public policy dictates that Mr. Remus Williams and Mr. Morris Morley were in detention while at Miami-Dade General Hospital from September 1, 1975 and through the entire period of their stay thereafter as patients at the Hospital and that the Defendant County is liable for reasonable medical expenses for Mr. Remus Williams and Mr. Morris Morley.
We disagree with this line of reasoning.
Even if there were "reasonable grounds" to believe that Williams had committed a felony (as to Morley, there were none) such a finding is plainly not equivalent to one that he had been taken into county police custody. As the court noted in State v. Robbins, supra, at 359 So.2d 39:
"The fact that the police had probable cause to arrest respondent at the time of his temporary detention and transport to the hospital does not change the result. The police may delay an arrest beyond the completion of their investigation, ..."
The lower court's conclusion was apparently based on the "public policy" that hospitals should be encouraged to treat emergency patients. But, it is for the legislature, and not the courts, to devise the means by which that end, however desirable, should be achieved. 10 Fla. Jur.2d Constitutional Law § 147 (1979). In Sec. 401.45, Fla. Stat. (1977), the legislature has required licensed hospitals like the appellee to provide treatment to all persons who require it on an emergency basis. Moreover, such facilities may be required to respond in damages if they fail to discharge that duty. See, e.g., Hunt v. Palm Springs General Hospital, Inc., 352 So.2d 582 (Fla. 3d DCA 1977). Even if mere humanitarian considerations were not enough, these very practical factors provide sufficient motivation for a hospital to admit needy persons who require its care. It was therefore unnecessary and improper to attempt to encourage this result by requiring the taxpayers, rather than the appellee itself, to discharge this obligation by extending the county's responsibility beyond that imposed by Sec. 951.23.